IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID WRAY,                        )
                                   )
            Plaintiff,             )
                                   )
        v.                         )        1:09-cv-00095
                                   )
CITY   OF   GREENSBORO   and       )
MITCHELL   JOHNSON,   in   his     )
Official   and   Individual        )
Capacities,                        )
                                   )
            Defendants.            )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

        Plaintiff David Wray ("Wray") brings this action against
his former employer, the City of Greensboro, North Carolina
("City"), and Mitchell Johnson ("Johnson"), the former City
Manager, for race discrimination in violation of 42 U.S.C.
§ 1981.  Before the court are motions by the City and Johnson
for summary judgment (Docs. 44 & 47) and to strike certain
documents filed in connection with Wray's response (Docs. 63 &
65).  For the reasons set forth below, Defendants' motions for
summary judgment will be granted, and the motions to strike will
be denied as moot.  Because this disposition resolves all claims
over which the court has original jurisdiction, the court
declines to exercise supplemental jurisdiction over the
remaining claim of the complaint, and the action will be
remanded to the State court of origin.

## I.  BACKGROUND

The facts, viewed in the light most favorable to Wray as the non-moving party, show the following:

Wray, a Caucasian, began a career as a police officer with the Greensboro Police Department ("GPD") in March 1981.  In July 2003, he was promoted to Chief of Police, succeeding two African-American predecessors.  (Doc. 54, Ex. 1 ¶¶ 3-4.) Johnson, who was then the Assistant City Manager, had led the search that ultimately resulted in Wray's selection.  (Doc. 45, Ex. 2 ¶¶ 9-11.)  Two years after Wray's promotion, Johnson became the City Manager.  (Id. ¶ 13.)

At the time of his appointment to Chief of Police, Wray was charged with cleaning up what the City regarded to be several areas of concern within the GPD, including discipline standards, department culture, and integrity, among other things.  (Doc. 54, Ex. 1 ¶ 6.)  To help accomplish this, Wray utilized the GPD's Special Intelligence Division ("SID"), which had been in existence for 25 years, to conduct certain internal investigations of officers thought to be engaged in improper conduct.  (Id. ¶ 7 & Ex. B.)  One such investigation involved GPD Lieutenant James Hinson ("Hinson"), an African American, whose name and phone number were allegedly found among materials in the possession of drug dealer.  (Id. ¶ 11.)

2

In connection with the investigation of Hinson, a
monitoring device (or tracker) was placed on the GPD vehicle
Hinson used while on duty. (Id. ¶ 12.) In the summer of 2005,
Hinson became aware of the tracking device and publicly alleged
that its use was racially motivated and that he was being
targeted for investigation based on his race. (Id. ¶ 13; Doc.
45, Ex. 2 ¶ 16.) Wray subsequently placed Hinson on paid
administrative leave pending the outcome of the investigation.
(Doc. 54, Ex. 1 ¶ 14.)

On June 17, 2005, Wray held a press conference during which
he announced that the GPD was involved in an ongoing criminal
investigation that included the use of internal investigations
conducted by the SID. (Doc. 45, Ex. 2 ¶ 20 & Ex. B.) Although
Wray never mentioned Hinson by name in the initial press
conference, the Greensboro News & Record (a local newspaper)
reported that Wray responded to a question during a telephone
interview about Hinson being under investigation by answering
"[y]ou connect the dots." (Doc. 54, Ex. 1-A (stating that
Wray's statement encouraged the newspaper to "read-between-the-
lines").) Thus, based on the press conference and additional
briefings by Wray, Johnson came to believe that Hinson was the
subject of a federal investigation. (Doc. 45, Ex. 2 ¶ 20.)

The Hinson investigation was not the only GPD investigation
to come under public scrutiny during June 2005. Also during

3

that time rumors began to surface in the Greensboro community, and were reported on by the Greensboro News and Record, that the GPD had begun to focus internal investigations on African-American officers through the use of a "black book." (Doc. 48, Ex. B at 55-56.) This "black book" allegedly contained pictures of African-American GPD officers and was being used to target these officers, based on their race, for internal investigations. (Doc. 45, Ex. 2 ¶ 17; see also Doc. 54, Ex. 1-J.) Wray apparently investigated these claims and reported to Johnson that no such "black book" existed. (Doc. 54, Ex. 1 ¶ 21.) Wray did, however, locate a photo array that had been prepared to investigate an alleged sexual assault by an African-American uniformed officer – this photo array contained pictures of the nineteen officers on duty at the time of the alleged sexual assault and was shown only to the victim. (Id.) After this photo array was discovered, it was stored in the trunk of another GPD officer's police vehicle. (Id.) Because Wray did not consider the discovered photo array to be the so-called "black book," he did not immediately bring its existence to Johnson's attention.[1] (Id. ¶ 23.)

---

[1] Wray points to the City's answers to interrogatories in a separate lawsuit where it admitted that it is "not aware of any documents or recordings in the possession of the City that indicate any other use of the photo array . . . other than to purportedly solve or prevent an alleged violation of the law." (Doc. 54, Ex. 1-D ¶ 10.) For purposes of this case, the court need not determine, and therefore does not

4

During the time that the Hinson investigation and "black book" became the subject of public concern, the National Association for the Advancement of Colored People and the City council, along with the public, began expressing concerns to Johnson about possible racial animus within the GPD. (Doc. 54, Ex. 2 at 55 ("There were some people who were expressing great deals of concern about the police department, about Chief Wray.").) Further, several high-ranking GPD officers (who were predominantly Caucasian) sought and obtained a meeting with Johnson during this time. They reported administrative problems under Wray's leadership, including improper use of the SID, and alleged that Wray had both directed GPD officers to improperly change discipline recommendations and improperly discussed personnel information in violation of North Carolina law. (Doc. 45, Ex. 2 ¶¶ 26-27 & Ex. 3 at 76-77.)

The North Carolina State Bureau of Investigation ("SBI") also contacted and met with Johnson to express concerns about the way GPD's SID was handling investigations because, according to the representatives, Wray, with whom they had raised these concerns, was not taking them seriously. (Doc. 45, Ex. 2 ¶ 28.) Johnson also learned that the Guilford County District Attorney

reach, the question whether the photo array was not a legitimate investigative technique, as claimed by critics of Wray's administration.

had requested that any future investigations of Hinson be referred to the SBI, although Wray did not notify Johnson of this fact. (Id. ¶ 23.) Finally, also during the summer of 2005, the police union for the City issued a vote of "no confidence" in Wray's leadership, and the attorney for the Greensboro Police Officers' Association informed Johnson that Wray had lied to him about some unknown issue. (Id. ¶¶ 24-25 & Ex. C (letter from William Hill, attorney for the Greensboro Police Officers' Association, stating that Wray "personally lied and was dishonest to my face").)

On July 27, 2005, Wray received a report from G.H. Kleinknecht, a law enforcement consultant, who had reviewed the GPD's policies and concluded that command and supervisory officers for administrative and criminal investigations were well-qualified and that the department performed at a high standard ("Kleinknecht Report"). (Doc. 57-2.) The report did recommend certain improvements. Wray also conducted his own internal investigation of "recent allegations that the Department has not been fair to some of its employees during the course of internal administrative investigations," including the investigation of Hinson. (Doc. 57-1 at 2.) On October 24, 2005, Wray sent Johnson a copy of his report, which found no impropriety. (Id.) This led Wray to report to Johnson that "[t]hese findings confirm my belief that the Greensboro Police

6

Department is consistent and equitable with regard to its internal review practices and that employees are treated fairly and appropriately with respect to their specific circumstances." (Id. at 2.)

Sometime after Wray's June 2005 press conference, Johnson received a report that caused him to determine that, contrary to Wray's statements, Hinson was not the subject of a federal investigation but in fact had been cleared of any wrongdoing after investigations back in 2003 and 2004. (Doc. 45, Ex. 2 ¶ 21; Doc. 54, Ex. 2 at 65.) Because of this and the concerns that had been expressed about Wray's honesty and management of the GPD, and despite the previous internal investigative reports, in November 2005 Johnson asked the City to hire an outside firm, Risk Management Associates ("RMA"), to investigate Wray's leadership and whether Wray had been honest with City executives and the public about the investigation of Hinson. (Doc. 45, Ex. 2 ¶ 29 & Ex. E (describing the report's goal as determining whether "the police chief provide[ed] accurate and truthful information to the City Manager . . . and/or the public at large regarding the suspension of Lieutenant Hinson, the discovery of the tracking device, and other related matters").)

RMA's resulting report ("RMA Report") was delivered to the City by letter dated December 19, 2005. (Doc. 45, Ex. 2 ¶¶ 39-40 & Ex. E at 17.) The RMA Report concluded that "there is

7

clear and convincing evidence" to support the conclusion that Wray did not provide truthful and accurate information regarding Hinson's suspension, the discovery of the tracking device, and related matters, that Hinson's suspension was "unnecessary and inappropriate," and that Wray may have violated at least two North Carolina criminal statutes in connection with a June 2005 union meeting. (Id. Ex. E at 17.) This caused Johnson to believe that Wray may have been misleading regarding the Hinson investigation, failed to properly oversee the police department, and may have violated North Carolina law. (Doc. 45, Ex. 2 ¶¶ 39-40.)

On January 6, 2006, Johnson met with Wray and informed him that he would be placed on administrative leave pending further investigation into issues raised by the RMA Report. (Id. ¶ 41.) During this meeting, both Johnson and Wray agreed that Assistant Chief of Police Tim Bellamy ("Bellamy"), who is African American, should serve as Acting Chief while Wray was on administrative leave. (Doc. 48, Ex. B at 70-72.)

Over the weekend of January 7-8, 2006, Johnson presented Wray with a choice: he could either resign and obtain certain post-employment benefits, or be terminated and lose the benefits. (Doc. 54, Ex. 1 ¶ 32.) On Monday, January 9, 2006, Wray submitted his resignation (Doc. 48, Ex. A at 11-12 & Ex. F)

and Johnson named Bellamy to the position of Interim Chief until a permanent replacement could be found. (Doc. 45, Ex. 2 ¶ 47.)

The City subsequently engaged in a search for a new Chief of Police. Its search involved the use of three panels of community leaders, including a North Carolina Supreme Court Justice, and City employees to assess the candidates' expertise in law enforcement, experience in managing community relations, and leadership and managerial experience, using a scoring system that Wray does not challenge here. (Doc. 48, Ex. G at 8-10; Doc. 45, Ex. 2 ¶¶ 50-52) From a group of applicants, these three panels selected and evaluated four finalists, of different races, for the position of Chief of Police. (Doc. 45, Ex. 2 ¶ 54.) Overall, Bellamy was rated the best candidate for the position by the combined panels and was hired as the Chief of Police. (Doc. 48, Ex. B at 145-46 & Ex. A at 53.)

Wray now alleges that Johnson constructively discharged him in order to placate rising political pressure to put an African American into the position of Chief of Police because of Wray's perceived racism. As such, Wray alleges he was discriminated against on the basis of his race, Caucasian, and constructively discharged in violation of 42 U.S.C. § 1981.[2]

---

[2] Both the City and Johnson previously moved to dismiss Wray's section 1981 claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 10 & 13.) The court dismissed Wray's claim to the extent they alleged disparate discipline but denied the motions with regard to

## II.  ANALYSIS

### A.  Motions to Strike

The City and Johnson have both moved to strike various documents submitted by Wray in response to the motions for summary judgment.  (See Docs. 63 & 65.)  Specifically, Defendants move to strike the following: (1) any reference to Johnson's 2004 performance review of Wray; (2) the City's responses to requests for admissions and interrogatories in Smith v. City of Greensboro, 08-cvs-5569 (Guilford County); (3) the plaintiffs' discovery responses in the related case of Alexander v. City of Greensboro, 1:09-cv-293 (M.D.N.C.); (4) internal memoranda addressing concerns of improper treatment of African-American officers; (5) news articles from the Greensboro News & Record; (6) a Memorandum of Understanding signed by Hinson; (7) the affidavit of Walter Jones, an attorney involved in representing certain African-American GPD officers; (8) the GPD internal affairs investigation regarding the "black book"; (9) anything regarding the City's inability to produce certain emails from the deposition of Walter Jones; (10) an audio

---

Wray's discriminatory discharge claims under section 1981.  Although the court noted that it was a "very close question" as to whether Wray stated a claim, it stated that Wray was "entitled to at least explore whether there is any other evidence to support the plaintiff's claim." (Doc. 26 at 43-44.)  Subsequently, the Magistrate Judge entered a discovery case management order that limited the scope of discovery to "the limited issue of the bases for any alleged actions by Defendant Johnson with respect to Plaintiff's employment and the hiring of a replacement for Plaintiff." (Doc. 31 at 1.)

recording of Joe Williams, the attorney for Hinson; (11) certain statements of opinion from Wray's affidavit; (12) an affidavit of Wray in which he attached as exhibits two GPD investigations; (13) allegations that Johnson ignored the results of internal investigations; and (14) allegations regarding an alleged connection between Wray's resignation and Hinson's reinstatement.

The court has reviewed this evidence and determined that, even considering it, summary judgment is still appropriate for Defendants. Accordingly, the motion to strike is rendered moot, and the court will turn to the summary judgment analysis. See Redman v. U.S. W. Bus. Res., Inc., 153 F.3d 691, 696 n.7 (8th Cir. 1998); Harbolt v. Steel of W.V., Inc., 640 F. Supp. 2d 803, 820 (S.D. W. Va. 2009); Tucci v. First Unum Life Ins. Co., 446 F. Supp. 2d 473, 487 (D.S.C. 2006).

**B.  Summary Judgment Motions**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]he party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine [dispute] of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (citing Celotex, 477 U.S. at 323).

11

When assessing a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any," Boitnott v. Corning Inc., 669 F.3d 172, 175 (4th Cir. 2012), but it views all facts and draws all reasonable inferences therefrom "in the light most favorable to the nonmoving party," Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 434 (4th Cir.), cert. denied, 132 S. Ct. 575 (2011). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012).

Wray alleges discrimination in violation of 42 U.S.C. § 1981. Section 1981 grants all persons within the jurisdiction of the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." This statute has long been held to prohibit an employer from discriminating against an employee based on the employee's race. Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 459-60 (1975). The protections of section 1981 apply to white, as well as nonwhite, citizens. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 286-87 (1976).

Where suit is brought against a state actor, as with Wray's claims against the City and against Johnson in his official capacity, "[42 U.S.C.] § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989). Pursuant to section 1983, a municipality will be found liable for an act of racial discrimination if the plaintiff shows that the discriminatory act represents the official policy of the municipality in that the decision-maker possessed "final authority to establish municipal policy with respect to the action ordered." Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004); see also Crowley v. Prince George's Cnty., 890 F.2d 683, 685 (4th Cir. 1989). In this case, the complaint alleges, and Defendants do not dispute, that Johnson was the decision-maker with final policy-making authority for the alleged adverse employment action taken against Wray. (Doc. 3 (Complaint) at ¶ 63.)

To prevail on his claims, Wray must establish that, with regard to section 1981, his employer intentionally discriminated against him on the basis of his race, and, with regard to section 1983, that the City's decision-maker with final policy making-authority (Johnson) intentionally took actions against Wray based on his race. Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004); see Reeves v. Sanderson Plumbing

13

_Products, Inc._, 530 U.S. 133, 153 (2000) (noting that the ultimate issue in a case alleging employment discrimination is "whether the plaintiff was the victim of intentional discrimination"). In assessing whether these standards are met, the court will look to both direct and circumstantial evidence of racial discrimination. _Clement v. Satterfield_, --- F. Supp. 2d ----, 2013 WL 765374, at *5 (W.D. Va. Feb. 28, 2013).

### 1. Direct Evidence

Wray's first avenue for establishing his claim is to produce direct evidence of racial discrimination. _Id._ at *7. Direct evidence is "evidence which, if believed, would prove the existence of a fact . . . without any inference or presumptions." _O'Connor v. Consolidated Coin Caterers Corp._, 56 F.3d 542 (4th Cir. 1995), _rev'd on other grounds by_ _O'Connor v. Consolidated Coin Caterers Corp._, 517 U.S. 308 (1996) (internal quotations and citation removed). In the context of this case, direct evidence comprises "statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." _Warch v. Ohio Cas. Ins. Co._, 435 F.3d 510, 520 (4th Cir. 2006).

Wray points to several items as direct evidence to support his claim. However, none suffices.

Wray points first to his 2004 performance evaluation by Johnson. The evaluation, which was favorable, included a

14

reference that Wray may be under increased scrutiny from the public on diversity issues because he was the first Caucasian Chief of Police in many years. (Doc. 54, Ex. 3 at 7 ("There have been a couple of areas that I hope we can continue to work on . . . [f]oremost are [Wray's] efforts as a leader and the efforts of his leadership teams . . . these actions need to be closely aligned with the organizations goals with regard to diversity. As the first Caucasian Chief in many years [Wray] and his leadership teams actions are observed to the minutest detail."); see also Doc. 62, Ex. 1 ¶ 8.) This is not direct evidence that Johnson or the City had any racial animus toward Johnson.

Wray cites next to Johnson's deposition testimony to show that Johnson was under political pressure to "remove" Wray from office. (See Doc. 54 at 14, citing Ex. 2 at 54-57.) However, the portions of the deposition cited by Wray fail to support this proposition. (See Doc. 54, Ex. 2 at 54-57 (stating only that Johnson was aware that members of the community and city council were concerned about possible racial targeting in the GPD).) To the extent Wray claims he was terminated based on public pressure founded on the (improper, he contends) notion he was perceived to be a racist, such claims are not actionable employment discrimination. Dartmouth Review v. Dartmouth College, 889 F.2d 13, 18 (1st Cir. 1989) (rejecting race

15

discrimination claim where there was no anti-white racial animus and the evidence "proves no more than that the College hierarchy perceived the Students' acts as racist"), overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004); Fox v. City of Greensboro, 807 F. Supp. 2d 476, 488 (M.D.N.C. 2011) (dismissing race discrimination claim by Caucasian plaintiffs when the crux of their complaint was that "Johnson's alleged actions were motivated not by Plaintiff's race, but by Plaintiff's alleged racism").

Wray also attempts to rely on Johnson's alleged disregard of the Kleinknecht Report and Wray's internal investigation report, which Wray characterizes as finding no issues with his leadership. (See, e.g., Doc. 54, Ex. 1 ¶ 24 & Ex. F (conclusion of the independent investigation that "the senior command officers responsible for the internal affairs and criminal investigation functions are qualified and have the experience and training required to manage effectively sensitive investigations").) But even if Johnson disregarded such investigative results, which did not even directly address his concerns about Wray's honesty, the separate RMA Report still revealed a legitimate basis for Johnson to have serious concerns about Wray's leadership. Additionally, Johnson's alleged disregard of these investigations is not evidence that, without

inference or presumption, establishes that Johnson took employment action against Wray based on his race. <u>Holley v. N.C. Dep't of Admin.</u>, 846 F. Supp. 2d 416, 427 (E.D.N.C. 2012) (stating that "[d]irect evidence is evidence from which no inference is required" such as "a decisionmaker's statement that he did not promote a plaintiff due to her race").

Wray next relies on a statement by City Attorney Linda Miles ("Miles") that she wanted an attorney to "[g]ive me what I need to get David Wray." (Doc. 56, Ex. 5 ¶ 6.) The statement does nothing to implicate Johnson, and, pursuant to section 1983, the City can only be liable for the acts of a person with final policy-making authority. <u>See</u> <u>Greensboro Prof. Fire Fighters Ass'n v. City of Greensboro</u>, 64 F.3d 962, 965 (4th Cir. 1995) (holding that only the Greensboro City Manager or City Council have final policymaking authority with respect to personnel issues). Accordingly, any statements or intentions of Miles are irrelevant, and, regardless, there is no evidence her statement was motivated by racial animus.

Finally, Wray points to the fact that during discovery the City was unable to provide certain emails from Johnson's and Miles's computers. Wray argues that the City and/or Johnson must have destroyed evidence and that Wray should benefit from an inference that the "missing" emails provide evidence of wrongdoing.

17

During discovery, the City was unable to find an email account for Miles, who had left employment with the City sometime in 2008. (Doc. 56, Ex. 13 at 54; Doc. 54, Ex. 2 at 10.) The City's Information Technology Director, Daryl Jones ("Jones"), testified that if the entire mailbox had been deleted (which he could not confirm was in fact the case), it could have been done by a system administrator. (Doc. 56, Ex. 13 at 54.) Additionally, the City was also unable to produce some emails from Johnson's account. The items that were unavailable include emails in Johnson's inbox folder prior to October 3, 2005, emails sent by Johnson before May 31, 2006, and emails deleted by Johnson prior to January 6, 2007.[3] (Id. at 25.) Jones testified that he did not know why these particular emails were not available (id. at 29), but that the likely reasons were that they were deleted, moved to another folder that cannot now be accessed, or never existed (id. at 29-30). Additionally, Johnson testified that he retained all his emails and produced any relevant emails in discovery. (Doc. 68, Ex. A at 25-31). In the end, this evidence is not helpful to Wray as direct evidence because, even assuming, without deciding, that Johnson's or Miles' emails were purged, this does not establish, without

---

[3] The items that were available to the City and were provided to Wray in discovery include: inbox emails from 10/3/2005 through 1/8/2007, emails in the sent box from 5/31/2006 through 1/8/2007, and deleted items from 1/6/2007 through 1/8/2007. (Doc. 56, Ex. 13 at 25.)

18

inference, that the City or Johnson took adverse action against Wray because of his race.

In sum, the court has searched the record and can discern no evidence which would, *without inference or presumption*, establish that the City and/or Johnson took action against Wray because of his race. Additionally, during deposition, Wray himself was unable to articulate any direct evidence of discrimination. (Doc. 48, Ex. A at 18, 40, 41, 46, 54 (stating that Wray had not found any statement that would constitute direct or firsthand discrimination by Johnson and that there was no "smoking gun").) Indeed, Wray admitted that his theory of the case was based on the "context of [his] work experience" (<u>id.</u> at 18) and that, based on his perception of events, he was "left simply with the common sense that . . . [his constructive discharge] was framed as a racial issue" (<u>id.</u> at 40) and that "there is the inference there, the animus, the connection is there to make that case" (<u>id.</u> at 41). Further, Wray was also unable to offer any direct evidence of discrimination in connection with the hiring of a new Chief of Police, and the court cannot discern any direct evidence on that point, either. (<u>See also id.</u> at 52-54 (Wray's statement that he has no evidence that the hiring panels that selected Chief Bellamy had been given any guidance that their job was to name an African-American Chief of Police, and that the documents in fact showed

19

they were advised only to assess the qualifications and give their best advice).)

Consequently, the court turns to an analysis of the circumstantial evidence.

### 2. Circumstantial Evidence

In discrimination cases under section 1981 where direct evidence is not available, the court will assess the claim using the same analytical framework applicable to claims of discrimination made under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. See Lightner v. City of Wilmington, N.C., 545 F.3d 260, 263 n.* (4th Cir. 2008). Thus, because Wray cannot produce direct evidence of racial discrimination, he has the opportunity to prove his claim through the burden-shifting framework established for the Title VII context in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278 (4th Cir. 2000). Under the McDonnell Douglas framework:

> [T]he plaintiff-employee must first prove a prima facie case of discrimination by a preponderance of the evidence. If she succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the prima facie case "drops out of the picture" and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th

Cir. 1996) (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 (1993)).

### a. Wray's *Prima Facie* Case

The parties cite different tests for Wray's *prima facie* case. Wray contends the elements in the present context are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) treatment different [from] that [of] similarly situated member[s] not of his protected class, citing <u>Reeves</u>, 530 U.S. at 142, and <u>White v. BFI Waste Servs., LLC</u>, 375 F.3d 288, 295 (4th Cir. 2004).[4] (Doc. 56 at 15.) Notwithstanding this recitation, Wray argues that the fact he was replaced by Bellamy, who is African-American, is sufficient to satisfy the fourth element. (<u>Id.</u> at 17.) Johnson adopts the first three elements but contends that the fourth element is the demonstration of circumstances that raise a reasonable inference of unlawful discrimination, citing <u>Adams v. Trustees of the Univ. of N.C.-Wilmington</u>, 640 F.3d 550, 558 (4th Cir. 2011). (Doc. 45 at 15.) Finally, the City simply assumes, without discussion, that Wray could establish a *prima*

---

[4] Wray characterizes his claim as one of "discriminatory disparate treatment" and does not cite the test for discriminatory discharge, the claim he appears to be pursuing. <u>See</u> <u>Hoyle v. Freightliner, LLC</u>, 650 F.3d 321, 336 (4th Cir. 2011) (stating elements of discriminatory discharge as membership in protected class, engagement in prohibited conduct comparable to that of misconduct of employees outside the protected class, and discipline more severe than that of those outside the protected class).

*facie* case and focuses instead on the remainder of the burden-shifting framework. (Doc. 48 at 12-14.)

The court need not resolve this apparent inconsistency as to the proper standard in this case because, even assuming Wray can meet the applicable standard for a *prima facie* case, he cannot overcome the remainder of the burden-shifting approach.

### b. Defendants' Legitimate, Non-Discriminatory Reasons

If a plaintiff establishes a *prima facie* case of discrimination, the employer may articulate a legitimate, non-discriminatory reason for the alleged adverse employment action. The burden on a defendant is one of production, not persuasion. Hicks, 509 U.S. at 509; see also Williams v. Cnty. of Fairfax, 164 F.3d 628, at *2 (4th Cir. 1998) (unpublished table decision).[5] In this case, Defendants have produced evidence that Johnson believed Wray was misleading in his statements about an investigation of Hinson and that Wray was mismanaging the GPD.[6]

---

[5] Unpublished decisions of the Fourth Circuit are not precedential but are cited for their persuasive authority. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (recognizing that "we ordinarily do not accord precedential value to our unpublished decisions" and that such decisions "are entitled only to the weight they generate by the persuasiveness of their reasoning" (citation omitted)).

[6] Johnson's belief was based in part on the RMA Report, the executive summary of which concluded in part:

> The report [] details findings and conclusions that support
> the position that Chief David Wray provided inaccurate and

22

See <u>McLean v. Broadfoot</u>, No. 4:10-CV-00019, 2011 WL 1833302, at *12-13 (W.D. Va. May 13, 2011) (employer had legitimate, non-discriminatory reasons when plaintiff submitted a misleading report); <u>see also</u> <u>Saucedo-Falls v. Kunkle</u>, 299 F. App'x 315, 324 (5th Cir. 2008) (per curiam) (finding that police chief stated non-discriminatory reason for plaintiff's termination when he "lost confidence in her ability to lead the Narcotics Division and because he wanted to restore public confidence after a scandal in that division"); <u>cf.</u> <u>Jones v. Dole Food Co., Inc.</u>, 827 F. Supp. 2d 532, 547 (W.D.N.C. 2011) (finding that an employee who gives misleading information to his employer is not meeting his employer's legitimate employment expectations); <u>Anglin v. Progress Energy Serv. Co.</u>, 645 F. Supp. 2d 519, 525-26

---

misleading information to the City Manager, Deputy City Manager, City Attorney, City Council members and/or the public at large regarding the suspension of Lieutenant Hinson, the discovery of the tracking device, and other related matters. RMA believes that a reasonable person would conclude that Chief Wray knew the detail of the history of the on-going criminal and administrative investigations into Lieutenant Hinson conducted under the direction of his Deputy Chief by the special unit of the Intelligence Section of the GPD. There is clear and convincing evidence to support the conclusion that Chief Wray did not provide truthful and accurate information regarding this matter and that the resulting suspension of Lieutenant Hinson was unnecessary and inappropriate. RMA also believes that the facts and circumstances support the conclusion that Police Chief David Wray may have violated at least two North Carolina criminal statutes during his June 16, 2005, meeting with union representatives.

(Doc. 46, Ex. E). To the extent other non-discriminatory reasons have been raised by Defendants, they need not be reached because the ones noted here are sufficient.

(E.D.N.C. 2009) (noting that evidence from an independent investigation that revealed that plaintiff had behaved inappropriately prevented plaintiff from establishing his *prima facie* case and also provided a legitimate, non-discriminatory reason for termination). These are sufficient to satisfy Defendants' burden of production.

### c.    Pretext

Because Defendants have met their burden of production, the court turns to Wray's burden to establish pretext. To survive a summary judgment motion a plaintiff must develop some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action. Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004). To establish a genuine factual dispute, a plaintiff must show both that the reason offered by the defendant was false and that discrimination was the real reason. Jiminez v. Mary Wash. Coll., 57 F.3d 369, 378 (4th Cir. 1995).

In this case, Wray attempts to establish pretext through the following facts (which overlap with Wray's proffered direct evidence of discrimination): that Johnson ignored the results of two investigations clearing Wray of wrongdoing; that Johnson participated in a "clandestine" meeting seeking to discredit Wray; that City Attorney Miles made a statement about "get[ing]

24

David Wray;"[7] that a Memorandum of Understanding with Hinson was signed the day following Wray's resignation; and that the City did not produce some emails from the email accounts of Johnson and Miles in discovery. (Doc. 54 at 18-20; Doc. 56 at 18-19.) Each will be addressed in turn.

Wray's first contention is that Johnson ignored the results of two investigations that cleared Wray of wrongdoing. According to Wray, an internal staff investigation (led by him) and the Kleinknecht Report determined there was no evidence of management issues in the GPD. (See Doc. 56, Ex. 1-E & Ex. 1-F.) Wray contends that Johnson's decision to disregard the conclusions of these reports and his initiation of the RMA investigation is evidence of pretext. The court disagrees. Defendants have provided evidence that Johnson, even before the RMA Report, had already determined that Wray had been dishonest or misleading in his depiction of the investigation of Hinson. (Doc. 45, Ex. 2 ¶ 21.) The evidence also establishes that Johnson initiated the RMA Report, despite the existence of other investigations, at least in part because of his concerns about Wray's representations about, and GPD's possible involvement in, racial targeting of black GPD officers. (Id. ¶ 29.) Moreover,

---

[7] This allegation fails in the circumstantial evidence context for the same reasons that it fails in the direct evidence context. See supra Part II.B.1.

as noted, any effort to portray this as evidence that Wray was terminated for being perceived to be a racist fails as an employment discrimination claim.  See Dartmouth Review, 889 F.2d at 18; Fox, 807 F. Supp. 2d at 488.

Pretext does not exist, moreover, simply because a prior investigation reported no wrongdoing.  In McLean, an initial investigation cleared the plaintiff, a police officer, of any wrongdoing in connection with a shooting.  2011 WL 1833302, at *12.  However, the plaintiff's supervisor later undertook a separate investigation (following public complaints) and determined that the plaintiff had been misleading in statements he made about the incident.  Id.  The court found that there was no evidence of pretext in the supervisor's decision to credit the results of the later investigation.  Id.  Likewise, although initial investigations may have cleared Wray of wrongdoing, there is no evidence of pretext when Johnson, in response to public complaints, directed an additional investigation led by a third party that ultimately was unfavorable to Wray.[8]

_____

[8]  Wray attempts to undermine the RMA Report by claiming that it was the product of inappropriate investigative techniques, including "unscheduled ambush style polygraphs and prolonged, haranguing and threatening interrogations." (Doc. 54, Ex. 1 ¶ 13.)  These claims are unavailing, however, as Wray has no factual support, besides his own opinion, for his statements.  Further, even if RMA used "unprecedented" techniques to gather information, there is no evidence that the use of such techniques was motivated by racial animus against Wray.

26

Wray next points to Chief Bellamy's testimony regarding a "clandestine" meeting as evidence of pretext. Specifically, Chief Bellamy testified that there was a "private meeting" involving himself, a member of the City Attorney's staff, Johnson, and an attorney from the Police Officers' Association. (Doc. 56, Ex. 6 at 18.) According to Chief Bellamy, the conversation at the meeting "centered around how people and employees and subordinates within the police department were being treated, about the morale of the police department." (Id.) Wray also points out that Chief Bellamy conceded in the meeting that Wray never did anything detrimental to Bellamy's career or discriminated against him. (Id.) However, this is not evidence that the meeting was meant to seek information to discredit Wray based on his race; instead, the record reflects that the information being discussed at the meeting involved the overall morale of the police department and officer concerns. The fact that someone, now unknown, inquired during the meeting whether Wray was discriminating against Bellamy (and was told that Wray was not) falls short of showing that the reasons given for Wray's termination were false and pretext for discrimination based on race.

Wray next points to a Memorandum of Understanding ("MOU") with Hinson that was agreed to before Johnson placed Wray on administrative leave but signed January 10, 2006, the day

27

following Wray's resignation. The MOU allowed Hinson, who Wray had placed on leave, to return to duty the following day. (Doc. 54, Ex. 1-K, Ex. 2 at 65, 68.) In the MOU, the City agreed that Hinson's personnel records would be purged of the investigations initiated against him and that his career advancement would not be negatively impacted thereby. (Doc. 54, Ex. 1-K.) Wray's theory seems to be that Hinson's return to duty the day after Wray's termination is evidence of some kind of plot by Johnson to remove Wray from office because of negative public opinion surrounding Wray's investigation of a black officer. But just because race is incidentally implicated in this scenario does not support the claim that the City or Johnson took action against Wray because of his race. Once again, Wray's theory establishes only that he was removed because of possible political pressure and public perception about his targeting of black officers, which is not actionable.

Wray's last attempt to show pretext is based on evidence (discussed earlier) that the City did not produce all emails from Johnson and Miles' email accounts in discovery. Wray now claims that a fact finder could infer that the City was concealing information regarding Johnson's discriminatory actions and that its failure establishes that the given reasons for suspending Wray were mere pretext for race discrimination. To infer that the allegedly missing emails contained evidence of

race discrimination is a leap of faith simply too great for the court to take, especially considering there is no evidence of bad faith and the City began preserving emails two years before the initiation of this lawsuit. (Doc. 56, Ex. 13 at 25.) Thus, even viewing the evidence in the light most favorable to Wray, the court cannot rest Wray's discrimination claim on a speculative inference of pretext based in the City's inability to produce allegedly incriminating emails that may not have ever existed.

In the end, the ultimate question is whether Wray has adduced sufficient evidence to support an inference of racial discrimination. See Jiminez, 57 F.3d 369 at 378 (noting that to show pretext, a plaintiff has the burden to show that the real reason for the adverse employment action was discrimination). Viewing the facts in the light most favorable to Wray, the most nefarious scenario the court can discern is that the City and Johnson placed Wray on administrative leave and constructively discharged him because there was a public perception (whether justified or not) that Wray was targeting African-American members of the GPD for investigation. Wray has not produced any evidence from which it can reasonably be inferred that Johnson's actions were based on the fact that he was Caucasian.

Thus, even assuming Wray could establish a *prima facie* case of race discrimination, he has failed to produce sufficient

29

evidence that the City's legitimate, non-discriminatory reason was pretextual. See Lightner, 545 F.3d at 265 (finding no inference of racial discrimination where it was established that plaintiff was suspended to stop his internal investigation for ticket fixing).

C.   **Remaining Claim for Declaratory Judgment**

The court's dismissal of Wray's section 1981 claims leaves Count I as the remaining claim of his lawsuit. That claim seeks a declaratory judgment as to the City's obligation to defend and indemnify Wray in connection with other litigation in which he was named as a defendant. (Doc. 3 ¶¶ 57-61.) The claim does not arise under federal law or the Constitution, nor does diversity exist between Wray and Defendants. There is no dispute that the court's exercise of jurisdiction over this claim exists only through the court's powers to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). (See Doc. 1 ¶¶ 5-6.) The court has notified the parties at the outset that if the section 1981 claims resolved, it would likely remand the action to the State court from which it was removed for resolution of this quintessential state-law claim. That time has arrived. Accordingly, having dismissed all claims over which the court has original jurisdiction, the court declines to exercise supplemental jurisdiction over Count I, the remaining claim. 28 U.S.C. § 1367(c). The action will therefore be

30

remanded to the General Court of Justice, Superior Court Division, Guilford County, North Carolina.

## III. CONCLUSION

For the reasons stated, therefore,

IT IS ORDERED that the motions for summary judgment by the City (Doc. 47) and Johnson (Doc. 44) are GRANTED, and the motions to strike by the City (Doc. 65) and Johnson (Doc. 63) are DENIED AS MOOT.

IT IS FURTHER ORDERED that, having dismissed all claims over which the court has original jurisdiction, the court declines to exercise supplemental jurisdiction over Count I, the remaining claim, which is REMANDED to the General Court of Justice, Superior Court Division, Guilford County, North Carolina.

                                                    /s/   Thomas D. Schroeder
                                              United States District Judge

August 19, 2013